IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BRADLEY JENSEN, | ) | |
| | ) | |
| Plaintiff, | ) | 4:07CV3155 |
| | ) | |
| v. | ) | |
| | ) | |
| NEBRASKA PUBLIC POWER DISTRICT, | ) | MEMORANDUM AND ORDER ON |
| | ) | DEFENDANT'S MOTION FOR |
| Defendant. | ) | SUMMARY JUDGMENT |
| | ) | |

On June 5, 2007, the plaintiff, Bradley Jensen, filed a four-count petition against Defendant Nebraska Public Power District (NPPD) in the District Court of Dakota County, Nebraska, alleging that the defendant discriminated against him on the basis of his age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621, et seq. (Count I); discriminated against him on the basis of his age in violation of the Nebraska Age Discrimination in Employment Act, Neb. Rev. Stat §§ 48-1001 et seq. (Count II); engaged in "unlawful and unfair employment practices" in violation of Neb. Rev. Stat. § 48-1104 (Count III); and breached an oral contract with the plaintiff (Count IV). (See generally Petition, filing 1, Ex. A (hereinafter "the complaint").) The defendant removed the action to this court, (see filing 1), and on February 5, 2008, the defendant filed a motion for summary judgment on each of the plaintiff's claims. (See filing 23.) The plaintiff consents to the entry of summary judgment against him on Count III, (see filing 31 at 1, 18), but otherwise resists the defendant's motion. For the following reasons, I find that the defendant's motion must be granted.

## I.   BACKGROUND

The plaintiff is a resident of South Sioux City, Nebraska, and is approximately 51 years of age. (Def.'s Br., Statement of Uncontroverted Facts, filing 27 (Def.'s Facts) ¶ 1.) In 1975, he began working for South Sioux City as a lineman for the city's electrical transmission system. (Id. ¶ 3.) From 1975 to 1985, his duties required him to work "mainly out of a 'bucket truck,'"

1

and he was required to climb utility poles on occasion. (Pl.'s Br., Statement of Additional Controverted Facts, filing 31 (Pl.'s Facts) ¶ 2.) In 1985, the plaintiff moved to the "underground crew," where he "was responsible for digging ditches and [putting] electrical lines underground." (Id. ¶¶ 3, 4 (citing Def.'s Index, Ex. 1, Jensen Dep. at 14:22-23).) Eventually, he became the senior lineman/superintendent, and his duties included "supervis[ing] crews, installing fiber optic, doing metering, meeting with the potential customers, [and] buying product." (Id. ¶ 5.) After his move to the underground crew in 1985, the plaintiff "never had to climb a utility pole for . . . South Sioux City." (Id. ¶ 3.)

Early in 2001, South Sioux City transferred its electrical system to the defendant, which is a public power district organized under the laws of the State of Nebraska. (Def.'s Facts ¶¶ 2-3.) The plaintiff and other affected South Sioux City electrical system employees were given opportunities to apply for positions with the defendant. (Id. ¶ 4.) On January 10, 2001, the plaintiff applied for a "Lineman" position with the defendant. (Id.) Sometime thereafter, the plaintiff was interviewed by Dick Gries, who was a manager for the defendant. (Id.; see also Pl.'s Facts ¶ 10.) During the interview, the plaintiff told Gries that he "hadn't climbed poles for many years, and [he] wouldn't go to work for [the defendant] unless that was part of it." (Pl.'s Facts ¶ 11.) Gries responded that the plaintiff would not have to climb poles because he would be working on the underground part of the system. (Id. ¶ 12.) This agreement was not reduced to writing, however. (Id. ¶ 15.)

On February 13, 2001, the defendant sent the plaintiff a written offer for the position of "Lead Line Technician in Retail Operations" in South Sioux City. (Def.'s Facts ¶ 5.) The written offer did not mention an exemption from pole climbing. (See Def.'s Index, Ex. 3.) The plaintiff accepted the offer on February 15, 2001, and he began working for the defendant on March 1, 2001. (Def.'s Facts ¶ 5.)

The "Position Profile" for the "Lead Line Technician-Retail" position provided that "[b]asic lineman climbing skills" were among the "[c]ompetencies [w]hich [s]hould [b]e [d]emonstrated." (Id. ¶ 7; Def.'s Index, Ex. 5.) The plaintiff recalled receiving the Position Profile from a Mr. Loseke–who is identified only as a "NPPD Employee"–sometime after the plaintiff began his employment with the defendant. (Pl.'s Facts ¶ 19.) The plaintiff did not

2

believe that the climbing requirement applied to him, however, in light of his agreement with Gries. (Id.) The plaintiff discussed the position profile's climbing requirement with Loseke, and he made Loseke aware of the agreement with Gries. (Id. ¶ 20.) Loseke replied by indicating that pole climbing was a part of the plaintiff's duties. (Id. ¶ 21.)

In November 2003, the plaintiff's supervisor, Sterling Stolpe, informed the plaintiff that the defendant was going to reclassify the plaintiff as a "Journey Line Technician-Retail" and relieve him of his supervisory responsibilities. (Def.'s Facts ¶ 6; Def.'s Index, Ex. 6.) As a result of this reclassification, the plaintiff's pay grade was reduced by one level. (Def.'s Facts ¶ 6.) This pay grade reduction had the potential to affect the plaintiff's ability to advance his pay, but his rate of pay remained unchanged after the reclassification. (Id.; see also Def.'s Index, Ex. 1, Jensen Dep. at 26:12-27:8.) The plaintiff asked Stolpe and Deb Hamlin[1] whether the reclassification would "change anything," and he was told "no." (Pl.'s Facts ¶ 26.) He did not ask specifically whether the new position included climbing responsibilities, however. (Def.'s Index, Ex. 1, Jensen Dep. at 29:5-12.) There is evidence that by 2006, the "Position Essential Functions for the Journey Line Technician" included the following physical requirement: "Manually ascend and descend wood poles approximately 25' to 85' and work aloft." (Def.'s Facts ¶ 8.) Nevertheless, there is no evidence that the plaintiff actually had occasion to climb a pole during the ordinary course of his employment with the defendant. Indeed, the plaintiff states that the defendant disposed of his climbing gear sometime after it took over operations in South Sioux City. (Pl.'s Facts ¶ 34.)

The plaintiff stated in his deposition that since about 2003, Stolpe subjected him to age-based discrimination and harassment. (Def.'s Index, Ex. 1, Jensen Dep. at 66:2-67:4) Specifically, the plaintiff stated,

> I would clean an area of the shop, and he'd have them come in and tear everything out after it was cleaned. I took a day off. I had a type of a bookcase/desk. I came back and the desk was gone and, unfortunately, most of the maps of the area was gone, which I was never able to find again.

---

[1]There appears to be no dispute that Hamlin was an employee of the defendant. The plaintiff cites an excerpt from his deposition wherein he states that he believed Hamlin to be employed in "HR" at the relevant time. (See Pl.'s Facts ¶ 24.)

3

> I come back to a piece of countertop on top of two file cabinets - - two drawer file cabinets. I took off, and the City of South Sioux had their maps that were stored in the area in another building, and I took a day off, or when on vacation, I come back to find out he had them all thrown away.
>
> We would go in for meetings in the morning, and I would have to - - I was supposed to be out of there by 7:30, but I might come back in for parts, and the whole crew would still be in a meeting.

(Id.)

The plaintiff also stated in his deposition that sometime in 2004, Barry Campbell[2] circulated a memo or an email stating that the defendant was not retaining younger workers and that the defendant was going to try to encourage younger workers to stay with the company. (Pl.'s Facts ¶ 27.) The plaintiff has not come forward with a copy of this document, however. The defendant states that it has "reviewed the meeting minutes of its Employee Committees," which would have been available to the plaintiff via a link appearing in the defendant's online newsletter, "to determine whether the alleged Campbell e-mail message was ever sent." (Def.'s Reply Br., filing 34, at 6.) The defendant has identified four minute entries that relate either to the age of the defendant's workforce or to efforts to encourage younger workers to remain with the defendant. The first entry, which appears in the minutes of an April 7, 2004, committee meeting, includes the following "employee question" and a response from William Fehrman, who was then the defendant's president and CEO:

> Since NPPD is obviously looking for younger personnel to run the company why not just buy out anyone with 30-35 years of service? When you reach "85" you would be eligible for this package. One option could be a total payment on sick leave.
>
> RESPONSE: Bill Fehrman - I do not agree with the observation regarding "looking for younger personnel to run the company." I would suggest having this person look at the demographics of the management team, starting with the senior team and it will be noted that there is a good mix of experience levels. With regard to a buy-out, there may be a good business reason for a program in the

---

[2]Cambell is identified only as being "of NPPD." (Pl.'s Facts ¶ 27.) Evidence submitted by the defendant in its supplemental index of evidence indicates that Campbell was the defendant's General Manager of Operations from February 1, 2005, through November 12, 2007. (Def.'s Supp. Index, filing 33, Ex. 25, Ackman Aff. ¶ 4.)

4

future, but one is not being contemplated at this time.

(Def.'s Supp. Index, filing 33, Ex. 25, Ackman Aff. ¶ 6.)

The second entry, which appears in the minutes of a May 5, 2004, committee meeting, includes the following employee question and a response from Paul Brune, who was then the defendant's Maintenance & Construction Manager:

> When we have good co-ops we keep them around Part time because they are good help. But when we have an aging work force, why do we let them go work for the R E A? We spend a lot of time and money working with an individual. They are good help and we just let them go. Why?
>
> RESPONSE: Paul Brune - The benefit of employing co-op and part time employees is that they get a chance to see what the work at NPPD is all about and NPPD gets to take a look at them to see what kind of employee they are. I agree that many of them are good help but we also need to have a good business reason to keep them on the payroll. Keeping part time employees on the pay role [sic] until an opening comes available is hard to justify. I must continue to balance labor resources with available work and keeping part time employees on the payroll just because they are good help isn't enough justification at times.

(Id. ¶ 7.)

The third entry, which appears in the minutes of an October 19, 2004, committee meeting, includes the following employee question and a response from Fehrman:

> Are there going to be any buy-outs for employees with more than 30 years with the company?
>
> There was a similar question asked at the April 7, 2004, York Area Employee Committee Meeting, i.e., "Since NPPD is obviously looking for younger personnel to run the company why not just buy out anyone with 30-35 years of service? When you reach "85" you would be eligible for this package. One option could be a total payment on sick leave."
> Following is Mr. Fehrman's response:
>
> RESPONSE:
> Bill Fehrman - I do not agree with the observation regarding "looking for younger personnel to run the company." I would suggest having this person look at the demographics of the management team, starting with the senior team and it will be noted that there is a good mix of experience levels. With regard to a buy-out, there may be a good business reason for a program in the future, but one is not being contemplated at this time.

5

(Id. ¶ 8.)

Finally, the fourth entry, which appears in the minutes of a November 17, 2005, committee meeting, includes the following employee question and a response from "Human Resources":

> Due to the fact that we have an aging workforce and many people close to retirement, is there any consideration for a buyout? A buyout might save the District money in wages and benefits, open positions for others and eliminate positions that have been created for specific employees that may not be necessary.
>
> RESPONSE: HUMAN RESOURCES: At this time, there is no discussion regarding a buyout of employees. It is possible that this type of program could end up costing more money than anticipated. Some of the employees leaving would most likely be planning to leave anyway–whether there was a buyout or not. Also, there is a risk with this type of program that some of those leaving are those we would prefer not to lose. This, in turn, creates a need to refill positions and leaves the District with incurred costs and loss of knowledge, hiring, training, etc.

(Id. ¶ 9.)

It is undisputed that "[s]ince January 1, 2005, all [of the defendant's] Line Technicians have been required to complete pole top and/or bucket truck rescue training, including a hands-on proficiency demonstration as an annual re-qualification for these positions." (Def.'s Facts ¶ 10.) The plaintiff became aware of this policy in late 2005, and he acknowledges that in 2005, the defendant "was recertifying linemen for pole top rescue." (Pl.'s Facts ¶¶ 31, 35.) Citing his agreement with Gries, the plaintiff refused to complete the recertification test. (Id. ¶ 36.)

On or about March 31, 2006, Stolpe told the plaintiff that all Line Technicians "were required to re-qualify in the area of pole-top rescue." (Def.'s Facts ¶ 11.) Indeed, there is evidence that in 2006 and 2007, 165 Line Technicians completed the pole-top rescue proficiency demonstration, and 35 of these Line Technicians were older than the plaintiff. (Id. ¶ 20.) The plaintiff did not believe that he should be subject to this requirement, but he felt that if he refused, he would be fired. (Pl.'s Facts ¶ 44.) On March 31, 2006, the plaintiff attempted to climb a pole as part of the re-qualification process, but he failed to complete the demonstration. (Def.'s Facts ¶ 11.) The plaintiff was informed that he would be given six weeks to re-attempt the demonstration; that he would be required to undergo an "essential functions evaluation" to

determine whether he was physically capable of performing a pole-top rescue; that if he "attains the required pole top re-certification[,] he will maintain his present position"; and that if he "fails to attain the pole top re-certification[,] a review of his present position will be conducted." (Id. ¶ 12; Def.'s Index, Ex. 12; Pl.'s Facts ¶¶ 42, 45, 49-50.) Although the plaintiff was not told that he would be fired if he failed the demonstration, Stolpe told the plaintiff that he did not know "if there would be any position for" the plaintiff if he failed. (Pl.'s Facts ¶ 46.) Stolpe suggested that the plaintiff might gain proficiency in pole-climbing by participating in training opportunities at the York Operations Center and at a facility operated by the Northeast Community College in Norfolk. (Id. ¶ 13.) The plaintiff did not follow up with these suggestions, (id.; Pl.'s Facts ¶ 47), but he did practice climbing a pole in the backyard of an ex-NPPD employee, (Pl.'s Facts ¶ 48).

On May 12, 2006, the plaintiff made a second attempt at re-qualifying in pole-top rescue. (Def.'s Facts ¶ 14.) He climbed the pole and successfully lowered a training mannequin from the top of the pole. (Id.) As he descended the pole, he fell and severely injured his back. (Id.; Pl.'s Facts ¶ 58.)

"Since sustaining his back injury, [the plaintiff] has remained an employee of [the defendant] and has been receiving Workers' Compensation and long-term disability benefits, as well as employee health insurance." (Def.'s Facts ¶ 15.) The plaintiff "reached his maximum medical improvement for his back injury on May 8, 2007," but his ability to perform work-related functions is permanently restricted. (Id. ¶ 16.) After the plaintiff was released to return to work, the defendant offered him a "Temporary Transitional Employment position which was consistent with [his] permanent work restrictions." (Id. ¶ 17.) The plaintiff rejected this offer. (Id.) The defendant also advised the plaintiff of job openings as a meter reader and in "locating,"[3] and it offered the plaintiff a position "in another part of the state for a 30-40% pay cut." (Pl.'s Facts ¶¶ 72, 74.) The plaintiff did not accept any of these positions. He has stated that he will only accept a position if the following three conditions are satisfied: the position "must allow him to remain in Sioux City; it must have physical requirements that are consistent

---

[3]The plaintiff submits that the "locating" position was "similar to [his] old job." (Pl.'s Facts ¶ 72.)

with his work restrictions; and it must pay at least as much as the Line Technician position which he held at the time of his injury." (Def.'s Facts ¶ 19.) It is undisputed that since December 14, 2006, when the plaintiff's functional capacity evaluation was completed, the defendant "has not filled any positions in the South Sioux City office which [the plaintiff] could physically perform and which paid at or above what he was earning as a Line Technician." (Id.)

In February 2007, the plaintiff filed a charge of discrimination with the Nebraska Equal Opportunity Commission (NEOC) and the Equal Employment Opportunity Commission (EEOC). (Pl.'s Facts ¶ 59.) After receiving a right-to-sue notice from the EEOC, the plaintiff filed the instant complaint. (See generally Petition, filing 1, Ex. A & attachments.)

## II. STANDARD OF REVIEW

A motion for summary judgment shall be granted by the court "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "material" fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). If the moving party meets the initial burden of establishing the nonexistence of a genuine issue, then the burden shifts to the nonmoving party to produce evidence of the existence of a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment," Anderson, 477 U.S. at 257, and "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial," id. at 256 (citing Fed. R. Civ. P. 56(e)).

### III. ANALYSIS

The plaintiff's viable claims allege that the defendant engaged in unlawful age discrimination against the plaintiff (Counts I and II) and breached an oral contract with the plaintiff (Count IV). The defendant argues that it is entitled to summary judgment on each of the plaintiff's claims. My analysis of the defendant's arguments follows.

### A. Age Discrimination

The parties appear to agree that because the Nebraska Supreme Court looks to federal decisions interpreting the ADEA when analyzing claims raised under the Nebraska Age Discrimination in Employment Act, the plaintiff's state and federal age discrimination claims may be analyzed jointly. (See Def.'s Br., filing 27, at 12 (citing Allen v. AT&T Technologies, Inc., 423 N.W.2d 424 (Neb. 1988))); see also Billingsley v. BFM Liquor Mgmt., Inc., 645 N.W.2d 791, 801 (Neb. 2002). I note too that the parties rely exclusively on federal decisions in their briefs. (See Def.'s Br., filing 27, at 12-19; Pl.'s Br., filing 31, at 13-18; Def.'s Reply Br., filing 34, at 2-11.) Therefore, I shall analyze the plaintiff's state and federal age discrimination claims jointly, and my analysis will be based on federal law.

To establish a claim of age discrimination, a plaintiff may come forward with direct evidence of unlawful age discrimination or proceed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Lee v. Rheem Mfg. Co., 432 F.3d 849, 852-53 (8th Cir. 2005). The plaintiff argues that he has presented sufficient evidence to avoid summary judgment under either of these two frameworks. I shall consider these arguments in turn.

First, the plaintiff claims that there is direct evidence that he was subjected to age-based discrimination. Direct evidence "is 'evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.'" Lee, 432 F.3d at 853 (quoting Russell v. City of Kansas City, Missouri, 414 F.3d 863, 866 (8th Cir. 2004)). In other words,

> [d]irect evidence is "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the fact finder to infer that that

9

> attitude was more likely than not a motivating factor in the employer's decision." Not all comments that may reflect a discriminatory attitude are sufficiently related to the adverse employment action in question to support such an inference. For example, "'stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself'" will not suffice.

Walton v. McDonnell Douglas Corp., 167 F.3d 423, 426 (8th Cir. 1999) (citations omitted). See also Morgan v. A.G. Edwards & Sons, Inc., 486 F.3d 1034, 1042-43 (8th Cir. 2007).

The plaintiff argues that "[t]he email that was circulated by Defendant expressing concern about the age of its workers and its desire to retain younger workers" amounts to direct evidence of unlawful age discrimination. (Pl.'s Br., filing 31, at 14 (citing Def.'s Index, Ex. 1, Jensen Dep. at 60:1-9).) According to the plaintiff, the email expressed a concern that the defendant was having trouble retaining younger employees. The plaintiff admits, however, that the email said nothing about terminating–or otherwise treating adversely–older workers. (Def.'s Index, Ex. 1, Jensen Dep. at 62:15-63:8.) Although no copies of this email have been found, I shall assume for the purposes of this memorandum that the email described by the plaintiff was authored and distributed by Mr. Campbell in 2004, just as the plaintiff claims. Nevertheless, I find that the email cannot support a reasonable inference that a discriminatory attitude was more likely than not a motivating factor in any "challenged decision" that affected the plaintiff. First, and as noted above, the email did not state that older workers would be subjected to any sort of adverse treatment based on their age; rather, it merely expressed concerns about the retention of younger employees. Quite simply, the email did not directly express a discriminatory animus toward older workers. Cf. Erickson v. Farmland Industries, Inc., 271 F.3d 718, 725 (8th Cir. 2001) (noting that there is no direct evidence of age-based animus if such an animus can only be inferred from a comment). In addition, there is no evidence of a specific link between the email and the decisions challenged by the plaintiff. Indeed, "an inference is required" to link the email to the plaintiff, as the email evidently did not mention him specifically or indicate that Campbell was concerned about the plaintiff's age. Ramlet v. E.F. Johnson Co., 507 F.3d 1149, 1153 (8th Cir. 2007). Furthermore, there is no temporal connection between the 2004 email and any challenged decision, see id. (finding that "comments were not related to the decisional process" in light of the four-month interval between the comments and the employee's termination), and

there is no evidence that Campbell was involved in any relevant employment decision. Under the circumstances, it is clear that the email does not constitute direct evidence that the plaintiff experienced unlawful discrimination based on his age.

It remains to be determined whether summary judgment is appropriate under the McDonnell Douglas burden-shifting framework. Under this framework, the plaintiff must first establish a prima facie case of discrimination. Ramlet, 507 F.3d at 1153. To satisfy this burden, the plaintiff must show 1) that he was a member of a protected class; 2) that he was qualified for his position; 3) that he suffered an adverse employment action; and 4) that there are facts giving rise to an inference of unlawful age discrimination. Stidham v. Minnesota Mining & Mfg., Inc., 399 F.3d 935, 938 (8th Cir. 2005). If the plaintiff establishes a prima facie case, "a rebuttable presumption of discrimination arises," and "[t]he burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action." Ramlet, 507 F.3d at 1153 (citations omitted). "If the defendant provides such a reason, the presumption [of discrimination] disappears, and the burden shifts back to the plaintiff to show that the proffered reason was pretext for age discrimination." Id. (citation omitted). To meet this burden, the plaintiff must submit evidence that not only "creates . . . a fact issue as to whether [the defendant's] proffered reason is pretextual," but also creates "a reasonable inference that age was a determinative factor" underlying the adverse employment action. Carraher v. Target Corp., 503 F.3d 714, 717 (8th Cir. 2007).

The plaintiff alleges that the defendant discriminated against him on the basis of his age by failing to re-employ him after his injury. (See, e.g., Pl.'s Facts ¶¶ 63, 65; Pl.'s Br., filing 31, at 15-16.) The defendant argues that it is entitled to summary judgment on this claim because the plaintiff cannot establish that the defendant's failure to re-employ him was an "adverse employment action" and because the plaintiff cannot show that the defendant's nondiscriminatory reasons for failing to re-employ him are pretexts. (Def.'s Br., filing 27, at 13-16.) I shall assume, for the purposes of this memorandum, that the defendant's failure to re-employ the plaintiff is an adverse employment action and that the plaintiff can establish a prima facie case of discrimination. The defendant argues persuasively, however, that it had legitimate, nondiscriminatory reasons for failing to re-employ the plaintiff. Indeed, it is undisputed that the

defendant did offer positions to the plaintiff; that the plaintiff has refused to accept any position with the defendant unless three specific conditions are satisfied; that since the plaintiff's injury, the defendant has not filled any positions that satisfy the plaintiff's conditions; and that the defendant "followed the same policies, procedures and processes which it follows in dealing with all employees who suffer workplace injuries." (See Def.'s Facts ¶¶ 15, 17, 19; Pl.'s Br., filing 31, at 2.)

Because the defendant has come forward with legitimate, nondiscriminatory reasons for failing to re-employ the plaintiff, it falls to the plaintiff to demonstrate that the defendant's reasons are pretexts for age discrimination. In his brief in opposition to the defendant's motion for summary judgment, the plaintiff does not argue specifically that the defendant's reasons are pretexts. (See Pl.'s Br., filing 31, at 15 (indicating that the plaintiff believed that the defendant was only challenging the "adverse employment action" element of his prima facie case).) In some cases, however, the evidence submitted in support of a claimant's prima facie case can satisfy the claimant's burden at the final step of the McDonnell Douglas analysis. Cf. Carraher v. Target Corp., 503 F.3d 714, 717 (8th Cir. 2007) (citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000)); Stewart v. Independent School Dist. No. 196, 481 F.3d 1034, 1043 (8th Cir. 2007). Therefore, I have considered the evidence cited in the plaintiff's brief to determine whether there is a genuine issue that the defendant's proffered reasons are pretexts. In his brief, the plaintiff claims only that the jobs offered by the defendant "were not comparable" to his previous position and would have required him "to move away from South Sioux City." (Pl.'s Br., filing 31, at 15-16.) It is undisputed, however, that the defendant has not filled any "comparable" positions in South Sioux City since the plaintiff's injury. There is no evidence suggesting that the defendant's reasons for failing to re-employ the plaintiff are pretexts for age discrimination. As a result, I must conclude that the defendant is entitled to summary judgment on the plaintiff's age discrimination claims to the extent that they are based on the defendant's failure to re-employ the plaintiff.

The plaintiff also alleges that the defendant discriminated against him on the basis of his age by requiring him to climb poles and complete the pole top rescue demonstration. (See, e.g., Pl.'s Facts ¶¶ 61, 66; Pl.'s Br., filing 31, at 16-17.) Once again, the defendant argues that it is

entitled to summary judgment because the plaintiff cannot show that he suffered an adverse employment action and because the plaintiff was required to climb poles for nondiscriminatory reasons. (See Def.'s Br., filing 27, at 16-17.) I shall consider each of the defendant's arguments in turn.

First, the defendant argues that pole-climbing has been "an essential function of the Line Technician positions throughout Jensen's employment," and "requiring an employee to demonstrate that he can perform the essential function[s] of his job" cannot amount to an adverse employment action. (Def.'s Br., filing 27, at 16-17.) It seems to me, however, that the evidence on this point is in conflict. It is true that the defendant has submitted evidence that pole climbing was among the essential functions of Journey Line Technicians. (See Def.'s Index, Ex.25, Tweedy Aff. ¶ 4.) It is also undisputed, however, that the plaintiff had been working on an "underground" crew since 1985, and that he had no occasion to climb a pole in the ordinary course of his employment during that time. In addition, there is no dispute that Dick Gries told the plaintiff that his position with the defendant would not require him to climb poles. I find, therefore, that there is a genuine issue as to whether pole climbing was truly an essential function for a Line Technician working on an underground crew.[4]

"An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." Thomas v. Corwin, 483 F.3d 516, 528-29 (8th Cir. 2007) (quoting Wedow v. City of Kansas City, Mo., 442 F.3d 661, 671 (8th Cir. 2006)). The defendant has not persuaded me that its decision to impose a new pole-climbing requirement upon the plaintiff cannot amount to an adverse employment action. As the defendant has challenged only the "adverse employment action" element of the plaintiff's prima facie case, I find, for the

---

[4] In its reply brief, the defendant argues that "[a]ll technicians . . . were required to demonstrate pole top rescue proficiency" pursuant to OSHA regulations. (Def.'s Reply Br., filing 34, at 8.) The regulation cited by the defendant merely states, however, that employees must "be trained in and familiar with" safety-related practices and emergency procedures that "pertain to their respective job assignments" or are "related to their work and necessary for their safety." 29 C.F.R. § 1910.269(a)(2)(i). There is a genuine issue as to whether pole-top rescues pertained to the plaintiff's assignment on the underground crew or were related to his work and necessary for his safety in that position. In other words, it is not clear that the plaintiff was required to demonstrate pole-top rescue proficiency pursuant to OSHA regulations.

13

purposes of this memorandum, that the plaintiff has established a prima facie case of discrimination.

The defendant argues too, however, that it had a legitimate, nondiscriminatory reason for imposing the pole-climbing requirement on the plaintiff. Indeed, the defendant has submitted uncontradicted evidence that beginning in 2006, all of its Line Technicians were required to complete the pole-top rescue demonstration. One hundred and sixty five Line Technicians completed the demonstration during 2006 and 2007, including 130 who were younger than the plaintiff and 35 who were older than the plaintiff. It seems to me that the defendant has satisfied its burden of coming forward with a legitimate, nondiscriminatory reason for requiring the plaintiff to complete the pole-top rescue demonstration.[5] Therefore, the burden shifts to the plaintiff to show that the defendant's reason was in fact a pretext for age-based discrimination.

The plaintiff argues that the defendant's decision to require him "to demonstrate pole-top rescue ability was discriminatory <u>as applied to him</u> because he had an express agreement with Defendant that he would not be required to climb poles for his employment." (Pl.'s Br., filing 31, at 16-17 (emphasis in original).) He adds,

> By requiring him to do so, Defendant was requiring something of Plaintiff that it had previously promised not to require, and it was unjustified in doing so. The fact that some of Defendant's older employees were required to recertify is irrelevant, as they did not have the same agreement with Defendant that Plaintiff did. When this requirement is coupled with the email that had recently been distributed throughout Defendant stating concern over the age of the workforce and a desire to retain more younger workers, there is certainly enough to infer that Defendant was discriminating against Plaintiff due to his age.

(<u>Id.</u> at 17.)

I find that the plaintiff has failed to satisfy his burden of establishing that the defendant's proffered reason is a pretext for age discrimination. Preliminarily, I note that the plaintiff's

---

[5] I note parenthetically that the defendant's proffered reason for requiring the plaintiff to complete the safety demonstration qualifies as legitimate and nondiscriminatory even if some Line Technicians were not required to climb poles as a part of their ordinary job responsibilities. <u>See, e.g.</u>, <u>Slathar v. Sather Trucking Corp.</u>, 78 F.3d 415, 418 (8th Cir. 1996); <u>McLaughlin v. Esselte Pendaflex Corp.</u>, 50 F.3d 507, 511-12 (8th Cir. 1995) (citing cases holding that employers' business decisions may be based on good, bad, irrational, or ridiculous reasons as long as they are not applied in a discriminatory manner).

argument that Campbell's alleged email had "recently been distributed" is not supported by the record. Indeed, the interval between this email and the plaintiff's pole-top rescue demonstration may have exceeded two years.[6] Furthermore, and as noted above, the plaintiff's own testimony about the email indicates that the email expressed no discriminatory animus toward "older" workers. The email does not aid the plaintiff's claim that the defendant's pole rescue recertification requirement was a pretext for age-based discrimination.

    I also note that the plaintiff has not claimed that older workers were required to complete the pole-top rescue demonstration as part of an effort by the defendant to "weed them out." On the contrary, the plaintiff argues that it "is irrelevant" that other "older employees were required to recertify." Instead, in response to the defendant's evidence that all Line Technicians were required to complete the pole-top rescue demonstration, the plaintiff emphasizes that he had a special agreement with the defendant and that the defendant breached that agreement when it required him to complete the demonstration. However, even if I assume that the defendant breached an agreement with the plaintiff, the plaintiff has not come forward with evidence that could support a reasonable inference that this breach stemmed from an age-based discriminatory animus. In other words, there is no indication of a connection between the alleged breach and the plaintiff's age that could lead a reasonable factfinder to conclude that unlawful discrimination actually motivated the defendant's decision to require the plaintiff to complete the demonstration. Cf. McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507, 512 (8th Cir. 1995) ("[A]n employer has the right to . . . assign work, to change an employee's duties, to refuse to assign a particular job, and to discharge–for good reason, bad reason, or no reason at all, absent intentional . . . discrimination.").

    Because the plaintiff has not shown that the defendant's reason for requiring him to climb poles was a pretext for age-based discrimination, I must conclude that the defendant is entitled to summary judgment on the plaintiff's age discrimination claims to the extent that they are based on this pole-climbing requirement.

---

    [6]As noted above, the plaintiff does not recall precisely when the email was distributed, though he believes he received it in 2004. The plaintiff's pole-top rescue attempt occurred during the spring of 2006.

Finally, the plaintiff argues that the defendant subjected him to age-based harassment that created a hostile work environment. (See, e.g., Pl.'s Facts ¶¶ 62, 64; Pl.'s Br., filing 31, at 17-18.) "A hostile environment exists when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Gordon v. Shafer Contracting Co., Inc., 469 F.3d 1191, 1194 (8th Cir. 2006) (quoting Palesch v. Mo. Comm'n on Human Rights, 233 F.3d 560, 566 (8th Cir. 2000)). "Hostile work environment claims, whether based on age or sex, are analyzed under the same general framework." Weyers v. Lear Operations Corp., 359 F.3d 1049, 1056 n.6 (8th Cir. 2004). To establish a hostile work environment claim, the plaintiff must show that 1) he belongs to a protected group; 2) he was subjected to unwelcome harassment based on his status as a member of that protected group; 3) the harassment affected a term, condition, or privilege of his employment; 4) his employer knew or should have known about the harassment; and 5) the employer failed to take proper action. Peterson v. Scott County, 406 F.3d 515, 523-24 (8th Cir. 2005).[7] "Harassment must be both objectively and subjectively offensive," and I must "consider whether a reasonable person would find the environment hostile and abusive in light of all the circumstances, including whether the conduct 'is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.'" Id. (citation omitted).

The plaintiff argues that he was harassed in the following ways. First, he claims that the aforementioned email sent by Campbell in 2004 amounted to age-based harassment. (Pl.'s Br., filing 31, at 17.) Next, he claims that his demotion in late 2003 amounted to age-based harassment. (Id.) He also argues that "additional harassment . . . included the unannounced" changes to his "work area and effects," including the disposal of his "documents and maps," while he "was away from work." (Id.) He adds that he "believes that his former co-workers have been instructed by Defendant not to speak with" him since his injury. (Id. at 17-18.) Finally, he argues that the defendant's decision to require him to complete the pole-top rescue demonstration and the defendant's failure to find him a comparable position after his injury are acts of

---

[7]The latter two elements apply only to "claims of harassment by non-supervisory personnel." Gordon v. Shafer Contracting Co., Inc., 469 F.3d 1191, 1195 (8th Cir. 2006).

harassment. (Id. at 18.)

These acts, even when taken in combination, cannot support a hostile work environment claim because no reasonable person could find that the plaintiff's work environment was hostile and abusive. The evidence simply cannot support a finding that the plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." Gordon, 469 F.3d at 1194 (citation omitted). Furthermore, with the possible exception of the 2004 email, there is no evidence of a "causal nexus . . . between the harassment and the plaintiff's protected group status." Id. at 1195. In other words, although the plaintiff has identified a number of "incidents of friction"–specifically, his reclassification, the rearrangement of his work area and the disposal of his documents and maps, his belief that co-workers have been told not to speak with him, the alleged breach of his oral contract, and the defendant's failure to re-employ him–there is no evidence that those incidents were based on the plaintiff's age. Wallin v. Minnesota Dept. of Corrections, 153 F.3d 681, 688 (8th Cir. 1998) (citing Smith v. St. Louis Univ., 109 F.3d 1261, 1264 (8th Cir. 1997)).[8] I am mindful that "[a]ll instances of harassment need not be stamped with signs of overt discrimination to be relevant . . . if they are part of a course of conduct which is tied to evidence of discriminatory animus." Carter v. Chrysler Corp., 173 F.3d 693, 701 (8th Cir. 1999). In other words, "[h]arassment alleged to be because of [age] need not be explicitly [ageist] in nature." Id. See also Smith, 109 F.3d at 1265 (discussing Kopp v. Samaritan Health Sys., 13 F.3d 264 (8th Cir. 1993)). In the case before me, however, the only incident that is arguably age-related is the 2004 email. As I noted above, even if I assume that the email existed as the plaintiff recalls it, the email did not directly express an age-based animus. Because the plaintiff has not shown 1) that his workplace was permeated with severe discriminatory intimidation, ridicule, or insult, and 2) that the allegedly harassing actions taken by the defendant were "part of a course of conduct which is tied to evidence of discriminatory animus," it is clear that the defendant is entitled to summary judgment on the

---

[8]Indeed, the latter two incidents are the subject of the plaintiff's age-based discrimination claims, and for the reasons I have explained above, the plaintiff has failed to create a genuine issue as to whether those incidents were the product of a discriminatory animus.

plaintiff's age-based harassment claim.

For the foregoing reasons, I must conclude that the defendant is entitled to summary judgment on Counts I and II of the plaintiff's complaint.

### B. Breach of Contract

The plaintiff alleges that in accordance with an oral contract between himself and the defendant, "he would not be required to climb utility poles." (See Petition, filing 1, Ex. A, ¶ 37.) He alleges further that in May 2006, the defendant breached this oral contract by requiring him to climb a utility pole; that during his attempt to climb the pole, he fell and was injured; and that "as a result of these injuries, [he] has suffered damages, including, but not limited to, [the] loss of his job with Defendant." (Id. ¶¶ 38-40 (emphasis added).) The defendant argues that it is entitled to summary judgment on this claim because the Nebraska Workers' Compensation Act (NWCA) "furnishes the exclusive remedy for [the plaintiff's] injuries." (Def.'s Br., filing 27, at 20.) I agree.

"[I]f an injury arises out of and in the course of employment, the Worker's Compensation Act is the injured employee's exclusive remedy against his or her employer." Bennett v. Saint Elizabeth Health Systems, 729 N.W.2d 80, 84 (Neb. 2007). See also Neb. Rev. Stat. § 48-111; id. § 48-148 (providing that when an employee files a worker's compensation claim with or accepts any payment from the employer on account of personal injury, "such action shall constitute a release to such employer of all claims or demands at law, if any, arising from such injury"). It is undisputed that the plaintiff is covered by the NWCA and that he has been receiving benefits under the Act. The defendant argues that "[t]he contract damages which [the plaintiff] is claiming here are, in reality, damages because of the injury which arose out of and in the course of his employment." (Def.'s Br., filing 27, at 22.) In response, the plaintiff argues that the defendant beached its agreement with him when it demanded that he "climb a pole in order to keep his job," and that he is therefore "entitled to damages for breach of contract, including but not limited to lost wages." (Pl.'s Br., filing 31, at 18.) He adds,

> In the instant case, Plaintiff's damages for breach of contract are for the wages he would be entitled to if he continued to work for Defendant, while his personal injury (i.e. workers' compensation) damages are for the wages he has lost due to his injury, among other things. It might be that those damages overlap, to a

18

>degree, but there are also aspects of damages which do not overlap, and workers' compensation cannot be the exclusive remedy for damages that it does not cover.

(Id. at 19.)

I agree with the plaintiff's suggestion that the "wages he would be entitled to if he continued to work for Defendant" overlap with the "wages he has lost due to his injury." Indeed, it seems to me that they overlap completely. Furthermore, the plaintiff's complaint alleges specifically that the plaintiff's "breach of contract" damages have resulted from the injuries that he suffered in his fall. (See Petition, filing 1, Ex. A, ¶¶ 39-40.) Although the plaintiff now asserts that "there are aspects of damages" which do not stem directly from his injury, he has not identified those "aspects." In light of the foregoing, I find that the plaintiff's breach of contract claim is, in fact, a claim for damages stemming from his injury.

When considering whether the existence of an express contract of indemnification creates an exception to the NWCA's exclusivity rule, the Nebraska Supreme Court noted that "the basic exclusiveness rule generally cannot be defeated by dressing the remedy itself in contractual clothes." Union Pacific R.R. Co. v. Kaiser Agricultural Chemical Co., 425 N.W.2d 872, 878 (Neb. 1988) (quoting Vangreen v. Interstate Machinery & Supply Co., 246 N.W.2d 652, 654 (Neb. 1976)). Count IV of the plaintiff's complaint is a claim for damages stemming from an injury covered by the NWCA that has been dressed in "contractual clothes." Because the NWCA provides the exclusive remedy for this claim, the defendant is entitled to summary judgment on Count IV of the plaintiff's complaint.

**IT IS ORDERED** that the defendant's motion for summary judgment, filing 23, is granted.

Dated March 26, 2008.

BY THE COURT

s/ Warren K. Urbom
United States Senior District Judge